## ARGUED AND DETERMINED

### IN THE

# COURT OF COMMON PLEAS,

### FOR THE

## CITY AND COUNTY OF NEW YORK.

———————————————

In the Matter of the Assignment of BERNARD RICE *et al.* to LOUIS STERNBACH for the Benefit of Creditors.

[SPECIAL TERM.]

(Decided January, 1878.)

An assignee for the benefit of creditors continued the business of the assignors at retail for seven months after the assignment, selling goods during that period for $4,196.11, at an expense of $2,420, after which the remainder of the property was sold at auction for $2,815.41, at an expense of $267.25. In his account the assignee charged himself with the gross receipts, $7,011.51, and claimed to be allowed as expenses the above sums of $2,420 and $267.25, amounting to $2,687.25, besides $741.12 for legal services and other outlays ; giving as reasons for not selling the property at auction as soon as possible, that the goods were of such a character, that, if so sold, they would have brought hardly more than one-fourth of the sum received for them at private sale, and that, the assignment having been made in the spring, the goods were not then salable, being suitable for winter trade. *Held*, that the assignee should have stored and insured the property and prepared it for sale at a seasonable and favorable time ; and that he should therefore be charged with the estimated value of the goods if so sold, and be allowed the estimated

amount of expenses only of packing, cataloguing, storage, insurance, advertising, and auctioneer's fees, which would have been incurred had the property been so dealt with, besides his necessary expenditures for legal services.

MOTION to confirm the report of a referee upon the final accounting of an assignee under a general assignment for the benefit of creditors.

The facts are stated in the opinion.

J. F. DALY, J.—Bernard Rice and Ignatius Rice, dealers in fancy goods, consisting chiefly of millinery ornaments and fancy mock jewelry, and carrying on a retail business at No. 373 Broadway, became insolvent and made a general assignment to Louis Sternbach, which assignment was filed in the county clerk's office on April 17th, 1876. The schedules filed by the insolvents showed an indebtedness of $85,884.40 and assets nominally worth $62,246.43, but stated in the schedules to be actually worth only $8,259.85.

The assignee immediately entered upon the execution of his trust and performed it in the following manner: he carried on the retail business of the insolvents at their usual place of business for about seven months, paying the same rent as the assignors had previously paid, and employed both the assignors at a salary to sell the goods; at the end of the seven months he caused the balance of stock left, to be sold at public auction, which was effected in one day. The sales over the counter during the seven months he carried on the business amounted to $4,196.11. The expenses during that period amounted to nearly $2,420, leaving a balance in his hands of a little less than $1,800. The sales at auction amounted to $2,815.41, and the auctioneer's charges to $267.25, leaving a balance of $2,548.16. It is, however, stated that a portion of the expenses charged in the account for private sales were incurred in preparing the goods for the auction, but the specific proportion is not given. The assignee, it will thus be seen, charges himself with $7,011.52 proceeds of sales of the assigned property, and asks to be allowed the gross sum of $2,687.25

for expenses in realizing that amount, exclusive of $741.12 for legal services and other outlays.

The reason given for not proceeding to sell all the assigned property at auction as soon after he entered upon his trust as was possible, is that the goods were of such a character that if sold at public sale they would have been sacrificed; that they would have brought hardly more than one quarter of the sum they yielded at private sale over the counter, during the seven months he carried on the business; also, that they were not salable in the spring when the assignment was made, or in the summer, being a class of goods better adapted for winter trade. The testimony of the assignors and experts is given to this effect. He therefore assumed the responsibility of continuing for seven months the use of the store at a rent of $208 per month and of hiring the two assignors at a salary of $200 per month together, for the purpose of working off a stock of $7,011.52. The result is not creditable to his sagacity, if that were the only question in the case, for, expending $1,500 in salaries to the assignors and $1,128.28 for rent, with other outlays, he realized but $4,196.11 in the whole period. On the other hand the auction sale of the balance of goods yielded $2,815.41 at an expense of something over $267.25.

Taking the assignee's own explanation and proofs into account, it is manifest: 1st. That with the knowledge that the bulk of the assigned stock was not salable in the spring and summer seasons, but in the fall and winter, he assumed the heavy expenses of keeping open a store for the sale at retail of the goods during the very period when they were not in demand and would have been slaughtered if sold at auction. 2d. That he intentionally undertook at the outset of the execution of his trust to keep at retail for over six months a stock valued at no more than $8,259.85 in the schedules, at a certain monthly expense of nearly $450, with no prospect of realizing more for them owing to the season. And it is equally manifest that this whole arrangement was but an excuse for allowing the assignors to make a living out of the assigned property under the pretense of helping the creditors of the estate to a larger dividend ; and that the assignee undertook to carry on at the

Matter of Foley.

expense of the creditors through the assignors the very business which the latter had conducted until they became insolvent.

The duty of the assignee was unquestionably to take the stock into his possession and prepare it for sale at public auction at a favorable time. His expenses would then have been confined to packing, cataloguing, storage, insurance, advertising and auctioneer's fees; and it is difficult to understand why, if the surplus unsold stock brought $2,815.41 at auction, the rest of it, sold in a similar manner at a like favorable season, would not have netted more than the $1,800 which it produced under his management.

The accounts are referred back to take proof of the value of the assigned stock if sold at auction at a seasonable and favorable time, and to take proof in order to estimate the expenses indicated above; and with the balance, the assignee should, in my opinion, be charged, allowing him, however, necessary expenditures for legal services rendered the assignors in the preparation of the assignment and schedules, and rendered the assignee in his accounting.

Report referred back.